wo

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornele A. Overstreet, Regional Director of the Twenty-Eighth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,<br><br>Petitioner,<br><br>vs.<br><br>Western Professional Hockey League, Inc.,<br><br>Respondent. | No. CV-09-0591-PHX-ROS<br><br>**ORDER** |

**Procedural History**

On February 28, 2008, Petitioner, National Labor Relations Board Regional Director Cornele Overstreet, approved a Stipulated Election Agreement between Respondent, a corporation which operates a professional hockey league, and the Professional Hockey Players Association (PHPA), a union seeking to represent the athletes who participate in Respondent's league (Doc. 1 Px. 4 at 13-14). On March 25, 2008, the election was held and, on April 3, 2008, Petitioner certified PHPA as the exclusive collective bargaining unit for Respondent's hockey-player employees (Doc. 1 Px. 5 at 17, Px. 6 at 18). On November 3, 2008, after months of negotiation, the PHPA filed a complaint against Respondent with the National Labor Relations Board (NLRB or the Board), alleging failure to bargain in good

faith, in violation of 29 U.S.C. §§ 158(a)(1), (5) (Doc. 1 Px. 1 at 1-2). A second, almost identical complaint was filed on December 10, 2008 (Doc. 1 Px. 2 at 3). On March 6, 2009, Petitioner consolidated the two complaints into a single administrative enforcement action, seeking an order requiring Respondent to negotiate in good faith and establishing the frequency and duration of such negotiations (Doc. 1 Px. 3 at 4-12).[1]

On March 24, 2009, Petitioner filed a Petition for Temporary Injunction in this Court, pursuant to 29 U.S.C. § 160(j), which requested a cease-and-desist order, targeting Respondent's alleged bad faith conduct, and a bargaining order, setting minimum frequency and duration requirements for future negotiations (Doc. 1). On April 16, 2009, Respondent filed a Response (Docs. 20-22). On April 23, 2009, Petitioner replied (Doc. 25). On August 20, 2009, after denying a motion to dismiss based on jurisdictional issues (Doc. 56), a Temporary Injunction Hearing was held. Petitioner offered no additional evidence at the hearing. Respondent did offer evidence and, on August 21, 2009, Petitioner responded to such evidence (Docs. 59-60). For the following reasons, the Petition will be denied.

**Discussion**

**I. Standard**

**A. Section 160(j)**

Under § 160(j), a district court may temporarily enjoin the unfair labor practices of a party against whom an NLRB unfair-labor-practice administrative action is pending. See 29 U.S.C. § 160(j). The purpose of § 160(j) is "to alleviate the threat that delay in the [NLRB's] processing of unfair labor practice complaints would otherwise pose to the

---

[1] At the August 21, 2009 hearing, Respondent argued Petitioner's request that the Court order a schedule for negotiations violated the law. See Myers Investigative & Sec. Servs., Inc., 354 NLRB No. 51 at 2 n.2 (2009) (affirming an administrative law judge's (ALJ) denial of a scheduled negotiation remedy requiring the employer to meet with the union not less than twenty-four hours per month and not less than six hours per session). However, Myers does not so explicitly hold. While the Board upheld the ALJ's denial of the scheduled negotiation remedy because of "lack of support for this remedy in current Board law," one of the two Board members stated that the remedy "may be worthy of consideration in a future case." Id.

[National Labor Relation Act's] remedial goals." Miller v. Cal. Pac. Med. Center, 19 F.3d 449, 455 (9th Cir. 1994) (*en banc*). While some deference is accorded to the NLRB on factual issues, the final determination of whether to issue an injunction rests firmly within the discretion of the district court. See id. at 458 ("Even though § [160](j) is an exception to the primary jurisdiction of the NLRB over labor disputes, it reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests . . . when Congress wanted to tell the courts to give the benefit of the doubt to the Board's expertise, it knew how to do so."); Scott ex rel. Nat'l Labor Relations Bd. v. Stephen Dunn & Assoc.'s, 241 F.3d 652, 659 (9th Cir. 2001) (reviewing § 160(j) determination for abuse of discretion).

Although § 160(j) is silent concerning the criteria which must be satisfied before an injunction may be granted, "a major departure from the long tradition of equity practice should not be lightly implied" and thus the Court will apply the four traditional factors which govern the granting of preliminary injunctions. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391(2006) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982)) (interpreting the Patent Act to require application of the four traditional factors before granting a statutory injunction, despite the Act's silence on the question); Reno Air Racing Ass'n, Inc., v. McCord, 452 F.3d 1126, 1137 (9th Cir. 2006) (same interpretation for statutory injunctions under the Lanham Act, despite the Act's silence). The four factors are: whether the movant "is likely to succeed on the merits, [] he is likely to suffer irreparable harm in the absence of preliminary relief, [] the balance of equities tips in his favor, and [] an injunction is in the public interest." Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008). While prior Ninth Circuit precedent had articulated a more flexible standard for determining the propriety of a § 160(j) injunction, such precedent is now contrary to Winter and thus is "no longer controlling, or even viable."[2] Am. Trucking Ass'ns, Inc. v. City of

---

[2] Prior to Winter, Ninth Circuit district courts were instructed to examine the four factors on a "sliding scale." Miller, 19 F.3d at 459; Scott, 241 F.3d at 661 (internal citation omitted). Under this paradigm, if the petitioner established "probable success on the merits," then an additional

Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009); see also e.g. Norelli v. Fremont-Rideout Health Group, -- F. Supp.2d--, 2009 WL 937170, *2 (E.D. Cal. 2009) (applying Winter's traditional four factor analysis when determining the propriety of a § 160(j) injunction).

As with all preliminary injunctions, a § 160(j) determination does not result in an "adjudication on the merits but rather [is] a device for preserving the status quo and preventing the irreparable loss of rights before [a] judgment" that will be issued by an NLRB administrative law judge after an unfair labor practices hearing. Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984). Accordingly, evidence which would be inadmissible at trial may be considered. See Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) (*en banc*) ("It was within the discretion of the district court to accept [] hearsay for purposes of deciding whether to issue the preliminary injunction."). Finally, the movant always carries the burden of establishing entitlement to the injunction. See Winter, 129 S. Ct. at 374.

**B. Sections 158(a)(1), (5)**

Title 29 U.S.C. § 158(a)(1) provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights

---

showing of "possibility of irreparable harm," without more, satisfied § 160(j) and warranted an injunction. Scott, 241 F.3d at 661. If the petitioner only established the existence of serious questions concerning the merits and a fair chance of success, then the balance of hardships needed to tip sharply in petitioner's favor and "the strength of the [movant's] showing on the likelihood of prevailing on the merits [] affect[ed] the degree to which it [needed to] prove irreparable injury." Miller, 19 F.3d at 459. But see Winter, 129 S. Ct. at 375-76 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). While it is noted that Winter dealt with injunctions authorized by a federal court's general equitable powers and not by a particular statute such as the National Labor Relations Act, the Court finds this to be a distinction without a difference.

guaranteed in section 157 of this title." Section 157 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, *to bargain collectively through representatives of their own choosing*, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (emphasis added). Title 29 U.S.C. § 158(a)(5) clarifies that an employer's refusal "to bargain collectively with the representatives of his employees" is an "unfair labor practice."

Read together, these provisions create a duty for employers to negotiate in good faith with the collective bargaining representative. See Seattle-First Nat'l Bank v. Nat'l Labor Relations Bd., 638 F.2d 1221, 1223-25 (9th Cir. 1981); see also 29 U.S.C. § 158(d) ("For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times *and confer in good faith*") (emphasis added). "Ascertaining compliance with the duty to bargain in good faith generally requires inquiry into an employer's motive or state of mind during the bargaining process" and "must be determined from an examination of the totality of circumstances." Seattle-First Nat'l Bank, 638 F.2d at 1225; see also In re Pub. Serv. Co. of Okla. (PSO), 334 NLRB 487, 487 (2001) ("From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement."). The burden is on the NLRB to show "substantial evidence" of the employer's *bad-faith intent*. See Seattle-First Nat'l Bank, 638 F.2d at 1226 (internal citation omitted). While the content of bargaining proposals may infer bad faith, such evidence, without more, is insufficient to sustain a finding of bad faith. See id. Evidence of bad faith includes: dilatory tactics, efforts to by-pass the union, unreasonable bargaining demands and arbitrary scheduling of meetings. See e.g. Atlanta Hilton & Tower, 271 NLRB 1600, 1603 (1984).

## II. Findings of Fact

On April 21 and 22, 2008, Larry Landon (PHPA Executive Director), Rick Kozuback (President of Respondent's parent corporation), Duane Lewis (Respondent's then-Vice President of Operations and current Commissioner), and Matt Cunningham (Respondent's Assistant Commissioner) attended an introductory meeting at Respondent's corporate office in Phoenix (Doc. 1 Px. 6 at 19-20).[3] Introductions were the focus of the meeting and no negotiation took place. Afterward, Lewis requested and Landon sent copies of model collective bargaining agreements used by other professional hockey leagues (Doc. 2 Px. 13 at 486). Landon also sent Lewis a list of issues PHPA wanted to resolve during the collective bargaining process (Doc. 2 Px. 13 at 488-89).

On May 22 and 23, 2008, negotiation sessions were held in Dallas and attended by Landon, two PHPA attorneys and other PHPA support staff as well as Kozuback,[4] Lewis, Cunningham, Respondent's in-house counsel James Domaz and three owners of hockey teams participating in Respondent's league (Doc. 1 Px. 6 at 19-20).[5] During the May 22 session, Landon and Lewis were selected as spokesmen for the PHPA and Respondent and the parties engaged in what Landon described as a six-hour "frank dialogue" on various topics (Doc. 1 Px. 6 at 20). On May 23, PHPA representatives formally presented proposals on eight items (Docs. 1 Px. 6 at 20-21; 22 Ex. F). Respondent stated that the proposals would be presented to the absent team owners and no further negotiation took place that day (Doc. 1 Px. 6 at 20-21).

---

[3] Kozuback represented Respondent at the April 21 meeting; Lewis and Cunningham represented Respondent at the April 22 meeting.

[4] Kozuback only attended the May 22 meeting. He did not attend the May 23 meeting and was not subsequently involved in the collective bargaining process (Doc. 1 Px. 6 at 20).

[5] Respondent's league is composed of fifteen independently owned and operated hockey teams.

- 6 -

On May 27, five additional formal proposals were delivered to Respondent by PHPA (Docs. 1 Px. 6 at 21; 22 Ex. F). On June 11, 2008, Landon, upon Respondent's request, made a presentation to Respondent's Board of Governors in Phoenix and no negotiation took place at the meeting (Docs. 1 Px. 6 at 20; 22 Ex. 1 at 4).

On July 9 and 10, 2008, the parties met in Chicago for further negotiations. Respondent offered three counterproposals prior to or directly following the meetings, two of which resulted in tentative agreements (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). By July 17, 2008, PHPA had submitted the entire package of forty-seven proposals to Respondent (Docs. 1 Px. 6 at 23, 22 Ex. F).

The parties met again on August 20 and 21, 2008 at Respondent's office in Phoenix. Respondent presented ten counterproposals before or during these meetings (Docs. 2 Px. 10A at 465-67; 22 Ex. F). On the second day of negotiations, tentative agreement was reached on at least four items (Docs. 1 Px. 6 at 23-24; 22 Ex. F). At the end of the day on August 21, Respondent provided PHPA with an all-or-nothing package of eight more counterproposals (Doc. 2 Px. 11 at 469-78).[6]

The next meetings took place in Niagara Falls, Ontario on September 10 and 11, 2008, before or during which Respondent gave eight additional counterproposals (Docs. 2 Px. 10A at 465-67; 22 Ex. F). By the end of the month, three more counterproposals were submitted and agreement was reached on two items (Docs. 2 Px. 10A at 465-67; 22 Ex. F).

On September 24 and 25, 2008, direct communications, both written and electronic, were sent to Respondent's hockey-player employees, one on Respondent's letterhead and the other electronically signed by some or all of Respondent's team owners. In relevant part, the communications stated:

> The Union is asking for things that benefit the Union and not just players, so this means that the monies that could have been used to improve the team would then be diverted to support Union

---

[6] Two counterproposals were rejections.

- 7 -

> overhead . . . Players need to be aware of the situation with right-to-work states. Players who play in these states do no need to pay dues to the Union should they decide they do not want to. (Doc. 2 Px. 13 at 560-63)

On September 30, 2008, in response to Respondent's alleged failure to timely respond to PHPA proposals and other alleged bad-faith bargaining tactics, such as the above-cited communications, PHPA called a strike (Docs. 1 Px. 6 at 26; 22 Ex. 1 at 10-11).

The strike ended after four days and meetings were subsequently held in Denver on October 8 and 9, 2008 (Doc. 1 Px. 6 at 26). In addition to discussing a no-strike agreement, Respondent offered seven written and three verbal counterproposals (Docs. 2 Px. 10A at 465-67; 22 Ex. F).[7] Nine agreements resulted from the Denver meetings (Docs. 2 Px. 10A at 465-67; 22 Ex. F).

In November and December 2008, complaints were filed against Respondent with the NLRB, alleging failure to bargain in good faith, and negotiations ceased (Doc. 1 Px. 1-2). Meetings resumed in Fort Collins, Colorado on January 15 and 16, 2009 (Doc. 22 Ex. 1 at 8-9). Before or during the negotiation sessions, Respondent offered seventeen counterproposals (Docs. 2 Px. 10A at 465-67; 22 Ex. F). Only one agreement resulted from the Fort Collins meetings. Although Respondent offered twelve additional counterproposals following the Fort Collins meetings, no negotiation sessions were convened between February and April 2009 (Docs. 2 Px. 10A at 465-67; 21 at 25; 25 at 6-7).

Although limited evidence has been offered for the period between April and August 2009, Respondent claims and Petitioner does not persuasively dispute that significant negotiations have occurred during this period and agreements have been reached on no fewer than fourteen additional proposals (Docs. 59-60).[8] Thus, at the time of the hearing,

---

[7] One counterproposal was a rejection.

[8] At oral argument, Respondent claimed eighteen additional agreements had been reached during this period. Petitioner claimed only fourteen additional agreements had been reached.

- 8 -

agreement had been reached on approximately thirty-five of Petitioner's forty-seven proposals.

## III. Conclusions of Law

### A. Likelihood of Success on the Merits

Petitioner argues Respondent has engaged in unfair labor practices, pursuant to §§ 158(a)(1) and (5), by intentionally stalling negotiations for the collective bargaining agreement ("CBA") with the purpose of depleting PHPA's support among Respondent's hockey-player employees, filing a decertification petition and ousting the Union (Doc. 25 at 3-4). Thus, according to Petitioner, an injunction is necessary to prevent further weakening of the PHPA before the unfair labor practice charges are administratively adjudicated and corrective action is taken. In support, Petitioner presents both direct and circumstantial evidence of Respondent's alleged bad-faith conduct occurring during CBA negotiations from April 2008 through January 2009. For the reasons that follow, the proffered evidence is insufficient to carry Petitioner's burden for granting a temporary injunction.

As direct evidence, Petitioner offers the affidavit of PHPA Executive Director Larry Landon which sets forth the statement of Tracy Egeland, a member of Respondent's Board of Governors, who said that Lewis, Respondent's lead negotiator, told Egeland: "if [Respondent] drags out negotiations with the Union long enough, [Respondent] could get enough players to support a decertification petition and that [Respondent] could get rid of the Union" (Doc. 25 Px. 16 at 654). See Atlanta Hilton & Tower, 271 NLRB at 1603 ("efforts to bypass the union" are an example of "conduct [which] has been held to be indicative of a lack of good faith"). Although having probative value, Lewis' statement is weakened because it is triple hearsay. While it is "within the discretion of the [Court] to accept []

---

Significantly, the parties reported that agreement had been reached on some critical disputes including, arbitration, severance pay, bereavement leave, off-ice dental insurance, Christmas Break and the All-Star Break.

- 9 -

hearsay for purposes of deciding whether to issue [a] preliminary injunction," the Court will only do so if the movant provides some basis for accepting the proffered hearsay as reliable. Republic of the Philippines, 862 F.2d at 1363. Testimony subject to cross-examination is always preferable, especially when the burden of proof is high. Petitioner has failed to provide such supporting evidence, either in the moving papers or during the temporary injunction hearing, and thus Lewis' statement has limited value.

Petitioner also offers circumstantial evidence, including the September 24-25, 2008 communication allegedly sent by Respondent to its hockey-player employees, suggesting an intent to weaken the employees' confidence in PHPA and undermine the Union rather than bargain in good faith (Doc 2 Px. 13 at 560-53). Petitioner is correct that the communication creates an inference of bad faith.[9] However, given the number of unresolved factual questions surrounding the communication and its origin, the inference is again weak. It is unclear who authored the communication and whether it was authorized by Respondent's management. The electronic version is signed by the "Owners," ostensibly referring to some or all of the owners of teams participating in Respondent's league, who may or may not have been speaking on behalf of Respondent's CBA negotiating team. The written version, while printed on Respondent's letterhead, is signed by an author whose identity, due to an illegible signature, is unable to be determined. Absent Petitioner's authentication of the communication documents or additional evidence indicating the communication's authorship or under what circumstances it was transmitted, the inference of bad faith Petitioner seeks to draw is minimal.

---

[9]See United Tech.'s Corp., 274 NLRB 1069, 1095 (1985) (When bargaining in good faith, an employer may not, "by casting doubt in the minds of the membership as to the bona fides of the efforts of union representatives in advancing the inter[e]st of its membership, seek to drive a wedge between the membership and its union.") (internal citation omitted); Gen. Elec. Co. (New York, N.Y.), 150 NLRB 192, 195 (1964) ("It is inconsistent with this obligation [bargaining in good faith] for an employer to mount a campaign . . . for the purpose of disparaging and discrediting the statutory representative in the eyes of its employee constituents . . . to create the impression that the employer rather than the union is the true protector of the employees' interests.").

Another example of bad faith offered by Petitioner is Respondent's delay, between four-to-eight months, in responding to approximately fifteen of PHPA's initial proposals, such as the standard player contract, marketing and licensing rights, severance pay and Christmas vacation (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). See Clear Pine Mouldings, Inc. v. Nat'l Labor Relations Bd., 632 F.2d 721, 729 (9th Cir. 1980) (Where the delay was five months, the court held: "An intent to frustrate and delay meaningful bargaining is evidenced by an unreasonable delay in making a counteroffer."); Atlanta Hilton & Tower, 271 NLRB at 1603 ("delaying tactics" are an example of "conduct [which] has been held to be indicative of a lack of good faith"). Yet, in context, this evidence has lost its force because Respondent has, since April 2009, attentively responded to the fifteen proposals, almost one-half of which have resulted in agreements (Doc. 59).[10]

Even if the Court were to focus solely on the period from April 2008 to April 2009, a bad-faith finding based on Respondent's delay in providing counterproposals would be inappropriate. Outside of the fifteen delayed items discussed above, Respondent provided Petitioner with initial counterproposals within one-to-three months, which, given the number of items to be negotiated and Respondent's inexperience with collective bargaining, is not unreasonable on the facts presented (Docs. 2 Px. 10A at 465-67; 22 Ex. 1 at 1, Ex. F).[11]

---

[10] At oral argument, Petitioner argued Respondent only steadfastly resumed negotiation after April 2009 because of the threat of administrative and judicial action resulting from Petitioner's lawsuit. Respondent then explained, and Petitioner did not contest, that the costs of the stalled union negotiations, rather than the lawsuit, are what spurred Respondent's renewed diligence in negotiating. Given that Petitioner carries the burden in these proceedings and has failed to adequately address Respondent's position, Petitioner's argument is neutralized.

[11] Petitioner argues Respondent unreasonably delayed in providing responses to all of Petitioner's proposals from April 2008 to April 2009. However, Petitioner's arguments in support of this position misstate the facts. For example, according to Petitioner, "on July 9, [Respondent] was still unprepared to present counteroffers" (Doc. 3 at 26). This statement is untrue. Respondent made two counterproposals directly preceding the July 2008 meetings and a third directly following, two of which resulted in tentative agreements (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). Petitioner also incorrectly states: "After the end of the August 21 session, after more than three months of negotiations, Respondent finally presented its first counterproposals" (Doc. 3 at 27). In fact, Respondent had submitted seven counterproposals prior to the final day of the August 2008

Based on the totality of the circumstances, Respondent's initial delay in responding to the fifteen proposals was just as likely the result of inexperience with negotiating a CBA and novice counsel or a host of factors other than bad faith.

Petitioner's remaining evidence is not probative. Petitioner twice mentions Respondent's failure to schedule negotiations in June 2008 as evidence of dilatory tactics (Docs. 3 at 26; 25 at 4). See Atlanta Hilton & Tower, 271 NLRB at 1603 ("arbitrary scheduling of meeting[s]" and "delaying tactics" are examples of "conduct [which] has been held to be indicative of a lack of good faith"). Yet, the parties met at the end of May 2008 and in the beginning of July 2008. Moreover, Respondent invited Landon, PHPA's lead negotiator, to address its Board of Governors in June 2008. Given the factual context, the parties' failure to meet in June 2008 does not suggest a bad faith delay.

Petitioner also attempts to infer bad faith from various comments made by Respondent's CBA team during the negotiating sessions and Respondent's choices concerning legal counsel.

With respect to the comments, statements made in the context of heated negotiations do not amount to bad faith (Docs. 1 Px. 6 at 25-27; 22 Ex. 1 at 6-8). In such circumstances, the NLRB's admonition to be "specially careful not to throw back in a party's face remarks

---

negotiating sessions; five were submitted the week before (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). Moreover, despite Petitioner's characterization of the August 2008 meetings as wasted time, four tentative agreements resulted (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). Petitioner also mischaracterizes the September 2008 meetings, stating "when the Union asked for additional counteroffers, Respondent responded that it was a 'busy time' and that negotiations were 'going to fast,'" implying a total "failure to make proposals" (Doc. 3 at 27). In fact, Respondent made eight counterproposals either before or during the September 2008 meetings and three more following, two of which again resulted in tentative agreements (Docs. 2 Px. 10A at 465-67; 22 at Ex. F). Much of the frustration concerning Respondent's alleged failure to submit timely counterproposals appears to stem from a misunderstanding between the parties. According to Landon, the parties had agreed to a fourteen-day written response time on all proposals (Doc. 1 Px. 6 at 22). PHPA counsel Ron Jaros recounts the exchange differently, recalling not an agreement but silence: "The [Respondent's representatives] did not state anything to suggest that they disagreed with the ground rules" (Doc. 1 Px. 8 at 91). Lewis steadfastly denies agreeing to the fourteen-day response rule (Docs. 2 Px.13 at 618-19; 22 Ex. 1 at 4). Testimony was not presented for the Court to judge credibility or otherwise reconcile the disagreement.

made in the give-and-take atmosphere of collective bargaining" or "lend too close an ear to the bluster and banter of negotiations" is well-taken, as to do otherwise "would frustrate the [National Labor Relations] Act's strong policy of fostering free and open communications between the parties." See Logemann Bros. Co., 298 NLRB 1018, 1021 (1990) (internal citation omitted). None of Plaintiff's referenced comments amount to anything more than "bluster and banter."[12]

With respect to Respondent's choice of legal counsel, Petitioner calls attention to Respondent's reliance on James Domaz as primary counsel during labor negotiations, who admitted to having "no experience in labor law or collective bargaining" and was often busy with other commitments (Doc. 1 Px. 8 at 91). However, Petitioner cites no authority for the position that a party must hire a very experienced labor lawyer to negotiate in good faith. Moreover, even if Domaz was slow during some or all of the negotiations he participated in, it is not clear that his conduct affected negotiations because Lewis, who was fully engaged, was and continues to be Respondent's primary negotiator (Doc. 1 Px. 6 at 20). Moreover,

---

[12] For example, Petitioner cites the following comments of Respondent's in-house counsel (James Domaz), made at the September 2008 meetings in response to PHPA's request for more counterproposals, as indicative of bad faith delay: "[I]t's a busy time, we are trying hard, we have to hire more people" and "We are concerned that we are going too fast" (Doc. 1 Px. 6 at 25). Although certainly excuses for failure to submit counterproposals, these statements on their face are not indicative of bad-faith delay. Petitioner also highlights Lewis' alleged statement at the September 2008 meetings that: "the Employer could not counter propose because they had a model they had to live by" (Doc. 1 Px. 6 at 25). While this statement potentially shows bad faith, its context, following Landon's alleged renege on a promise concerning immigration issues, suggests rather "bluster" produced during a moment of tense negotiation instead of an intent not to bargain. The fact that team owner Randy Sanders, who participated on Respondent's CBA negotiating team, refused to enter into a memorandum of understanding at the end of the October 2008 meetings was further cited by Petitioner as an example of bad faith commentary. However, Sanders' statements were just as likely the product of high tension following the PHPA strike and Landon's alleged backtracking on a strike-related promise rather than an unwillingness to bargain (Doc. 1 Px. 6 at 26).

by August 2008, Respondents had obtained the assistance of more experienced outside counsel.[13]

Another example of bad faith relied on by Petitioner is Respondent's February 2009 proposal to limit future negotiations to an agreement that would terminate in May 2010 (Doc. 2 Px. 13 at 627-28). Petitioner argues the proposal was made in bad faith because, given the protracted nature of the negotiations, such an agreement would likely be finalized only to expire shortly after finalization and thus would be obviously unacceptable to PHPA (Doc. 3 at 28). See Atlanta Hilton & Tower, 271 NLRB at 1603 ("unreasonable bargaining demands" are an example of "conduct [which] has been held to be indicative of a lack of good faith"). Facially, Respondent's offer of a one-year contract does not appear to comport with good-faith. However, Respondent claims the one-year offer was made in response to PHPA's rejection of a proposed a five-year contract and bona fide concerns about the ongoing economic crisis (Docs. 2 Px. 13 at 627-28; 22 Ex.1 at 9). Petitioner denies Respondent made a five-year offer (Doc. 25 Px. 16 at 655). From this evidence, it is unclear whether Respondent's proposed one-year contract was motivated by bad faith (i.e. knowledge that the term would be unacceptable to PHPA), anger at PHPA's rejection of a five-year contract or genuine economic concerns.

Petitioner further argues Respondent's rejections of certain PHPA proposals or take-it-or-leave-it packages are indicative of bad faith (Doc. 3 at 12, 14-15). Yet, PHPA used, or at least condoned, these tactics during negotiations, which undermines Petitioner's claim that such tactics are illegitimate (Doc. 1 Px. 6 at 22, Px. 8 at 94). Moreover, as Petitioner readily admits, Respondent was not obligated to agree to any particular proposal advanced by PHPA and thus rejecting or packaging certain proposals, as long as most remained open for negotiation, is not the same as bargaining in bad faith. See 29 U.S.C. § 158(d) (The

---

[13] Thomas Kennedy, representing Respondent in the current proceedings, first appeared during the August 21, 2008 negotiations (Doc. 1 Px. 6 at 24-25). A second labor attorney, Patrick Scully, began representing Respondent during the October 2008 meetings (Doc. 1 Px. 6 at 26).

obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession"); Atlanta Hilton & Tower, 271 NLRB at 1603 ("[A]damant insistence on a bargaining position is not of itself a refusal to bargain in good faith").

The composite of Petitioner's evidence amounts to some evidence of "delaying tactics, unreasonable bargaining demands, . . . efforts to bypass the union, . . . and arbitrary scheduling of meeting[s]," along with some possible egregious comments by Respondent, all of which may be indicative of bad faith. Atlanta Hilton & Tower, 271 NLRB at 1603. But Petitioner's direct evidence of comments made by Respondent is weak and the circumstantial evidence is either neutral because of Respondent's answers to it or insufficient to show bad faith. Accordingly, Petitioner has failed to carry the burden of showing likely success on the merits.[14]

## B. Likelihood of Irreparable Harm

Petitioner has also failed to establish likelihood of irreparable harm.

Under Petitioner's theory of irreparable harm, Respondent's bad faith bargaining has prevented and continues to prevent the PHPA from securing meaningful benefits for

---

[14] Petitioner's case authority only emphasizes the disparity between what is alleged to be Respondent's bad-faith conduct and conduct found to violate §§ 158(a)(1), (5), that is, "deliberate and egregious bad-faith conduct" that has "pervaded the entire course of bargaining, beginning even before the first negotiation session and continuing after the last." Unbelievable, Inc., 318 NLRB 857, 858 (1995) (flagrantly unlawful conduct, such as consistently goading the union to strike, threatening to replace striking workers, and otherwise antagonizing union negotiators without apparent strategy was indicative of bad faith); see also e.g. My Store, Inc., 147 NLRB 145, 156-57 (1964) (threatening to discharge striking employees, discriminatory hour cutting, and other statements concerning employee retribution for participating in union activities were indicative of bad faith); Professional Eye Care, 289 NLRB 1376, 1391-92 (1988) (repeated statements that no contract would ever be reached and the lack of any participation in the bargaining process other than denying union suggestions were indicative of bad faith); Overnite Transp. Co., 296 NLRB 669, 671 (1989) (threatening plant closure, goading a strike, refusing to agree to almost every union proposal and promising never to sign a contract were indicative of bad faith); Nat'l Mgmt. Consultants, Inc., 313 NLRB 405, 408 (1993) (complete failure to bargain or offer counterproposals, without explanation, was indicative of bad faith).

Respondent's hockey-player employees and the longer Respondent delays the collective bargaining process, the more support for PHPA will wane among employees. Petitioner argues PHPA and the employees will be irreparably harmed by this decline in support, suffering great hardship, because Respondent may succeed in decertifying PHPA and thus deprive the employees of their rightfully elected collective bargaining representative before the NLRB has an opportunity to address Respondent's illegal conduct. Alternatively, Petitioner contends, even if PHPA is not decertified, the Union will likely lose employee support to such a degree that it will be unable to effectively bargain with Respondent regardless of future NLRB remedial action, an outcome which will similarly deprive the employees of their right to elected collective bargaining representation.

The law underlying Petitioner's theory of irreparable harm is correct. Irreparable harm may be established under § 160(j) if an employer's *continued* unlawful conduct will dissipate union support and weaken the union to such a degree as to threaten its prospective ability to bargain and render moot any future NLRB remedial action. See Miller, 19 F.3d at 460 ("In this connection [irreparable harm], as well as in considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the [NLRB's] remedial authority.").[15] However, the evidence does not support Petitioner's theory.

The mere allegation that an employer is engaging in unfair labor practices does not, without more, create a presumption of declining union support and establish a likelihood of

---

[15] See also Brown v. Pac. Tel. & Tel. Co., 218 F.2d 542, 544 (9th Cir. 1955) ("In view of the irreparable harm which the designated unions may suffer by the drifting away of their members . . . we think the law entitles the Board to the injunctive relief sought."); Scott, 241 F.3d at 667 (loss of bargaining power and member support due to illegal employer action is a proper consideration when determining irreparable harm under § 160(j)); Norelli v. SFO Good-Nite Inn, 2007 WL 662477, *14 (N.D. Cal. 2007) (finding irreparable harm because "Respondent's conduct would impair the employees' rights under the Act by causing an erosion of support from the Union, by impairing the effectiveness of the Union, by making it difficult to enforce union rules and regulations, and by making it difficult to preserve the collective bargaining process.").

irreparable harm. Otherwise, a petitioner need only allege unfair labor practices and recite the above dissipation-of-support theory to establish irreparable harm. Such an allegation must be supported by clear evidence, not speculation, establishing why Respondent's conduct will dissipate PHPA support and likely result in irreparable harm. See Scott, 241 F.3d at 668 (accepting petitioner's theory that respondent's illegal practices will dissipate union support, causing irreparable harm, because the "nature of [respondent's] labor practices, as well as the record, support[] the conclusion that such practices played a major part in this drop of support."); Reichard v. Foster Poultry Farms, 425 F. Supp.2d 1090, 1100 (E.D. Cal. 2006) (accepting similar theory concerning irreparable harm because "Petitioner presents evidence that Respondent is using the situation to further depress union support").

Petitioner argues PHPA's status as a new union exposes PHPA to a risk of declining membership (Doc. 3 at 30-31). While PHPA's age may lend support to Petitioner's argument, without more, this claim is speculation, failing to establish a concrete link between Respondent's conduct, declining Union support and a likelihood of irreparable harm. The cases cited by Petitioner do not support Petitioner's position, as all require a showing of more than the union's age to satisfy § 160(j)'s irreparable harm requirement.[16]

Petitioner further argues the geographic dispersion of PHPA members' off-season residences establishes that Respondent's unfair labor practices will result in the dissipation of Union support and irreparable harm because "the Union will not even be in a position to communicate with the employees in an attempt to maintain their support" (Doc. 3 at 31).

---

[16] See e.g. Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 500-01 (7th Cir. 2008) (credible "testimony of many [of respondent's] employees who stated that they were hesitant to attend Union meetings because they feared discrimination," in addition to the union's age, established decline in union membership and irreparable harm caused by unfair labor practices); Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 373-74 (11th Cir. 1992) ("substantial evidence," as well as the union's age, were sufficient to establish that unfair labor practices would result in declining union membership and irreparable harm); see also Reichard, 425 F. Supp. 2d at 1100 (evidence that "normally high employee turnover rate compounds the risk of irreparable harm," as well as the union's age, were sufficient to establish declining union membership and irreparable harm caused by unfair labor practices).

This argument is not convincing. It is unclear why, in the age of modern communication, PHPA would be unable to maintain contacts with its membership, via telephone, e-mail or other technology, despite the members' seasonal dispersion throughout Europe and North America. Without some evidence in support, this argument is rejected.

Moreover, even if Petitioner's contentions were supported by evidence, the circumstances surrounding the negotiations have changed since the Petition was filed in March 2009 and have substantially undermined Petitioner's arguments regarding irreparable harm. According to the parties' statements at the August 21, 2009 hearing and subsequent evidentiary submissions, negotiations progressed significantly between April and August 2009, with Respondent attentively responding to PHPA's proposals and the parties reaching accord on approximately seventy-five-percent of PHPA's requested CBA terms. Significantly, the parties reported that agreement had been reached on some critical disputes including, arbitration, severance pay, bereavement leave, off-ice dental insurance, Christmas Break and the All-Star Break. Further, while the Petition may have enhanced Respondent's enthusiasm at the bargaining table since April 2009, as discussed above in footnote 10, there is no reason to believe that this enthusiasm will dissipate and Respondent will cease negotiating in good faith simply because a § 160(j) injunction is, for today, not merited. Given these facts, there is presently no bad-faith conduct for the Court to enjoin. Any past wrongs committed by Respondent will be addressed by an NRLB administrative law judge during an unfair labor practices hearing. See Scott, 241 F.3d at 657 ("[T]he purpose of a section 10(j) injunction is to preserve the authority of the National Labor Relations Board ("Board") pending final administrative adjudication.").

Petitioner has failed to establish a likelihood of irreparable harm and the Petition will be denied.

Accordingly,

**IT IS ORDERED** Petitioner's Petition for Temporary Injunction (Doc. 1) **IS DENIED**.

DATED this 4th day of September, 2009.

_____
Roslyn O. Silver
United States District Judge