wo

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornele A. Overstreet, Regional Director) of the Twenty-Eighth Region of the) National Labor Relations Board, for and) on behalf of the National Labor Relations) Board, ) | No. CV-09-0591-PHX-ROS |
| ) | **ORDER** |
| Petitioner, ) | |
| ) | |
| vs. ) | |
| ) | |
| Western Professional Hockey League,) Inc., ) | |
| ) | |
| Respondent. ) | |

**Background**

On December 16, 2007, the National Labor Relations Board ("NLRB" or "Board") was reduced to four members, from a full complement of five, when the term of then-Chairman Battista expired. The remaining Board Members were Liebman, Schaumber, Kirsanow and Walsh. On December 28, 2007, the four-member Board delegated its litigation authority to NLRB General Counsel and its remaining powers to Board Members Liebman, Schaumber and Kirsanow. The delegations were made in anticipation of Walsh's and Kirsanow's imminent departure, due to expiring terms, and the likelihood of a resulting two-member Board, due to Congress' failure to nominate replacements (Doc. 47 Ex. A). On December 31, 2007, Walsh's and Kirsanow's terms expired and the Board was left with two

members.  See e.g. Ne. Land Serv.'s, Ltd., 352 NLRB No. 89 at n.2 (2008).  To this date, there still remain only two Board members.

On March 24, 2009, Petitioner (NLRB Regional Director) filed a Petition for temporary injunctive relief, on behalf of the Board and NLRB General Counsel, pursuant to § 10(j) of the National Labor Relations Act ("NLRA" or "the Act") (Doc. 1).  By April 23, 2009, the Petition was fully briefed (Docs. 21, 25).  On May 7, 2009, Respondent filed a Motion to Dismiss for lack of subject matter jurisdiction, alleging the Petition was not properly authorized because the NLRA requires at least three Board members to approve the filing of such a petition and only two members were presiding in March 2009 (Doc. 28).  On May 13, 2009, Petitioner responded, arguing that the current two-member Board may authorize the filing of § 10(j) petitions and, in the alternative, that the four-member Board's December 28, 2007 delegation to the General Counsel permitted the Petition to be filed despite the Board's subsequent loss of two members on December 31, 2007 (Doc. 35).  On May 15, 2009, Respondent replied (Doc. 39).

On May 29, 2009, oral argument was held and supplemental briefing was ordered on the question of the General Counsel's authority to file a § 10(j) petition in the absence of a three-member Board (Docs. 42, 45).  On June 5 and 12, 2009,  a supplemental response and reply were filed (Docs. 47-48).  On June 17, 2009, new authority surfaced, addressing the same issue and applying the Chevron doctrine, an argument not raised by either Petitioner or Respondent.  See Snell Island SNF LLC v. Nat'l Labor Relations Bd., 568 F.3d 410 (2d Cir. 2009); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  On June 23, 2009, supplemental briefing was ordered to address the Chevron issue and, on July 1, 2009, simultaneous responses were filed (Docs. 51-55).  For the reasons that follow, the Motion to Dismiss will be denied.

**Discussion**

**I. Subject Matter Jurisdiction**

**A. Standard**

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") permits challenging a claim for "lack of subject-matter jurisdiction." A Rule 12(b)(1) motion may be facial or factual; the former is based on the facts of the claim and the latter alleges new facts. <u>See Safe Air For Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the [claim]" and "need not presume the truthfulness of the plaintiff's allegations." <u>Id.</u> The burden of proof rests on the party asserting jurisdiction. <u>See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.</u>, 546 F.3d 981, 984 (9th Cir. 2008). A ruling on jurisdictional questions must precede a ruling on the merits. <u>See Wilbur v. Locke</u>, 423 F.3d 1101, 1105 (9th Cir. 2005).

**B. Jurisdiction**

The Court retains jurisdiction over an action to temporarily enjoin unfair labor practices, pursuant to § 10(j) of the NLRA, only upon a properly filed petition by the NLRB. <u>See Amalgamated Clothing Workers of Am. v. Richman Bros.</u>, 348 U.S. 511, 517 (1955) ("Congress explicitly gave such jurisdiction [over § 10(j) temporary injunctions] to the district courts only on behalf of the Board on a petition by it").

**II. Motion to Dismiss**

Respondent argues the Board's loss of two members on December 31, 2007 reduced Board membership below the NLRA's three-member quorum requirement and thus the Board was without authority to authorize § 10(j) petitions. Accordingly, the Board's December 28, 2007 delegation of authority to the NLRB General Counsel is void and, on March 24, 2009, neither the Board nor Petitioner and General Counsel were authorized to file the current Petition. As a result, the Court lacks jurisdiction to hear this case.

This position is based on two propositions, both of which must be true to establish lack of jurisdiction. First, § 3(b) of the NLRA does not authorize the NLRB to administer the Act with a two-member Board. <u>See</u> 29 U.S.C. § 153(b) (". . . three members of the Board shall, at all times, constitute a quorum of the Board . . ."). Second, because NLRB General Counsel and Petitioner may file a § 10(j) petition only upon proper delegation of authority from the Board, all § 10(j) petitions filed by the General Counsel or Petitioner after December 31, 2007, including this one, are improper. <u>See</u> 29 U.S.C. § 160(j) ("*The Board shall have power* . . . to petition any United States district court, within any district . . . for appropriate temporary relief or restraining order.") (emphasis added).

Petitioner responds to the first proposition arguing that § 3(b), when read in its entirety, permits a two-member Board to administer the NLRA if certain statutory criteria are satisfied and that these criteria have been satisfied. <u>See</u> 29 U.S.C. § 153(b) ("A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, *except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof*.") (emphasis added). Petitioner responds to the second proposition arguing, even if § 3(b) prevents a two-member Board from administering the NLRA, well-established principals of administrative law preserve the Board's December 28, 2007 delegation to the General Counsel of § 10(j) petition authority despite the Board's present incapacity to act upon that authority. In the alternative, responding to both propositions, Petitioner contends the quorum requirements of § 3(b) extend only to the NLRB's adjudicative, not prosecutorial, functions and thus do not affect the Board's or the General Counsel's exercise of § 10(j) authority. Petitioner also advances a general policy argument.

Because Petitioner's interpretation of § 3(b) is correct and under the present circumstances a two-member Board is authorized to administer the NLRA, only the first proposition will be addressed.

**III. Proposition One**

**A. The Parties' Interpretation of Section 3(b)**

Respondent relies on <u>Laurel Baye Healthcare of Lake Lanier, Inc. v. Nat'l Labor Relations Bd.</u>, 564 F.3d 469 (D.C. Cir. 2009), which interpreted § 3(b) to require "unequivocally that a quorum of the Board is three members . . . at all times" and held a two-member Board is generally not authorized to administer the NLRA. 564 F.3d at 473. Petitioner relies primarily on <u>New Process Steel, L.P. v. Nat'l Labor Relations Bd.</u>, 564 F.3d 840 (7th Cir. 2009), which interpreted § 3(b), its legislative history and supporting case law to allow a two-member Board to administer the NLRA if certain statutory criteria are met and, according to Petitioner, the current Board has satisfied those criteria. Specifically, the Seventh Circuit held a two-member Board is permitted to administer the NLRA if: a quorum of three or more Board members delegates the Board's authority to a group of three Board members, one or more Board members is subsequently rendered incapable of serving and such loss reduces the Board to two. <u>See</u> <u>Id.</u> at 845-46.[1]

**B. Statute and Case Law**

Section 3(a) provides "the Board shall consist of five . . members." 29 U.S.C. § 153(a). Section 3(b) outlines contingencies for when all five Board members are unavailable to participate:

---

[1]

Despite Petitioner's citation to <u>Photo-Sonics, Inc. v. Nat'l Labor Relations Bd.</u>, 678 F.2d 121 (9th Cir. 1982), there is no Ninth Circuit opinion directly on point. <u>Photo-Sonics</u> is distinguishable, as the case did not deal with the issue of whether a two-member Board is authorized to administer the NLRA, but merely held that a three-member delegee panel assigned to adjudicate an administrative appeal was properly authorized to issue an opinion despite the departure of one panel member. Because the panel member's departure reduced the Board to four members, the question of interpreting the relationship between § 3(b)'s two quorum clauses was not at issue. <u>See</u> M. Edward Whelan III, <u>Quorum Requirements</u>, Op. Off. Legal Counsel, 2003 WL 24166831 at n.3 (Mar. 4, 2003) ("[I]n Photo-Sonics, the Board as a whole continued to have four members, even after one member of the 'group' resigned.").

[1] The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . [2] A vacancy[2] in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and [3] three members of the Board shall, at all times, constitute a quorum of the Board, [4] except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b).

According to the D.C. Circuit's interpretation, clause one establishes the Board's authority to delegate tasks to panels of three or more Board members. Clause two emphasizes that five members are not required for the Board to take an official action. And clause four is a provision which permits a delegee panel of three Board members to complete an assigned task even if one delegee must withdraw before completion, thus allowing a "quorum of any group designated pursuant to the first [clause]" to be duly constituted with two members. Under the D.C. Circuit's interpretation, the purpose of clause four is to prevent a panel of three Board members from entirely repeating a delegated task if one panel member becomes unable to serve. See Laurel Baye Healthcare of Lake Lanier, Inc., 564 F.3d at 472-73.

Within the D.C. Circuit's framework, clause three operates as an independent requirement, separate from the provisions in clauses one, two and four, mandating that the Board maintain a minimum of three members at all times. See Id. at 472 ("The use of the word 'except' [in clause four] is . . . present in the statute only to indicate that the delegee group's ability to act is measured by a different numerical value [than the Board's ability to act] . . . [and the] Board quorum requirement [in clause three] therefore must still be satisfied, regardless of whether the Board's authority is delegated to a group of its members [under

[2]

Although § 3(b) uses "vacancy" in the singular, the term has been uniformly interpreted to include multiple vacancies. See 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise – words importing the singular include and apply to several persons, parties, or things"); see also Op. Off. Legal Counsel, 2003 WL 24166831 at n.3.

clause four].").  According to the D.C. Circuit, to read clause four as modifying clause three would render clause three nugatory, or otherwise create an irreconcilable inconsistency within the express words of the statute, given that clause three requires "three members of the Board shall, at all times, constitute a quorum of the Board" and that such a reading of clause four would allow only two members of the Board to function as a quorum.  See Id. ("A cardinal principle of interpretation requires us to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant," a principle which would be violated by allowing clause four to modify clause three) (internal citations omitted).[3]

Hence, the D.C. Circuit held: once the Board loses a three-member quorum, as it did on December 31, 2007, a duly-constituted delegee panel of two loses the authority to administer the Act and the resulting two-member Board ceases to function.  See Id. at 473 ("As the Restatement (Third) of Agency sets forth, an agent's delegated authority terminates when the powers belonging to the entity that bestowed the authority are suspended . . . In the context of a board-like entity, a delegee's authority therefore ceases the moment that vacancies or disqualifications on the board reduce the board's membership below a quorum.").

The Seventh Circuit, however, departs from the D.C. Circuit's interpretation by reading "the plain meaning of the statute" to require that clause four modify clause three.  New Process Steel, L.P., 564 F.3d at 846.  See also M. Edward Whelan III, Quorum Requirements, Op. Off. Legal Counsel, 2003 WL 24166831 (Mar. 4, 2003) ("The provision for a two-member quorum of such a group is an express exception to the requirement that a quorum of the Board shall be three members").  Under the Seventh Circuit's interpretation,

---

[3]

Contrary to Petitioner's argument, the D.C. Circuit's reading of § 3(b) does not do violence to the ordinary meaning of the word "except," but rather clarifies which preceding clause is being excepted.  Nor is violence done to the ordinary meaning of the word "quorum," as the D.C. Circuit's interpretation merely clarifies to which group the two-member quorum requirement applies (Doc. 47 at 15-16).

clause four allows a duly constituted Board of three or more members to delegate its full authority to three members and, if one or more members subsequently become unable to serve, a two-member Board will satisfy the quorum requirements. See New Process Steel, L.P., 564 F.3d at 845 (Section 3(b) allows "the Board to continue to conduct business with a quorum of three members but expressly provides that two members of the Board constitutes a quorum where the Board has delegated its authority to a group of three members."). Under the Seventh Circuit's interpretation, the current two-member Board is validly administering the NLRA.

Although both the D.C. and Seventh Circuits reached a definitive interpretation of § 3(b), constructed from a close reading of the plain text, legislative history and prior case law, the Court is inclined rather to adopt the analysis of the Second Circuit which held:

> [T]wo of our sister circuits disagree over the 'plain meaning' of section 3(b) of the Act . . . [a]t the very least, this split suggests that the statute is ambiguous regarding the enduring or residual powers of an NLRB panel once the Board has lost a quorum

> Snell Island SNF LLC, 568 F.3d at 419-20,

and that:

> [T]he legislative history of the Taft-Hartley amendments lacks any clear statement of intent regarding the jurisdiction of a plenipotentiary panel where the Board loses its quorum

> Id. at 423.[4]

---

4

The Court notes that the Seventh Circuit also cited Taft-Hartley's legislative history in support of its interpretation of § 3(b); however, these arguments are not persuasive. According to the Seventh Circuit, the Taft-Hartley legislative history supports its interpretation of § 3(b) because "[t]here is no suggestion in the relevant reports that the Board is restricted from acting when its membership falls below a certain level." New Process Steel, L.P., 564 F.3d at 847; see also H.R. Rep. No. 80-245 at 6-7, 25-26 (1947); H.R. Rep. No. 80-510 at 36-37 (1947) (Conf. Rep.); S. Rep. No. 80-105 at 8-10, 19 (1947). However, the Seventh Circuit's inference from the Committee Reports' silence is speculative. An equally plausible inference is that the drafters did not believe the explicit phrase "three members of the Board shall, at all times, constitute a quorum of the Board" required further explanation.

The Seventh Circuit further held the legislative history supports its interpretation of § 3(b)

**C. The Board's Interpretation of Section 3(b): <u>Chevron</u> Analysis**

Having decided that neither the text nor the legislative history of the NLRA reveals a clear Congressional directive concerning the relationship between § 3(b)'s two quorum clauses, the Court, before reaching its own interpretation of § 3(b), must first determine whether a binding interpretation has already been issued by the Board, the agency responsible for administering the Act. <u>See</u> <u>Marmolejo-Campos v. Holder</u>, 558 F.3d 903, 908 (9th Cir. 2009) (*en banc*) ("If the statute is 'silent or ambiguous,' however, we may not supply the interpretation of the statute we think best (as we would without an agency pronouncement), but must limit ourselves to asking 'whether the agency's answer is based on a permissible construction of the statute.'") (citing <u>Chevron U.S.A., Inc.</u>, 467 U.S. at 843). The Board has issued two administrative interpretations of § 3(b), discussed in more detail, which essentially adopt the Seventh Circuit's analysis. The first task is to determine whether either interpretation carries the force of law and is thus sufficient to bind the Court as an official agency interpretation of the NLRA.[5]

---

because "[f]orbidding the NLRB to sit with a quorum of two when there are two or more vacancies on the Board would thus frustrate the purposes of the act," i.e. increased efficiency, by incapacitating the Board with the loss of three members. <u>New Process Steel, L.P.</u>, 564 F.3d at 847. However, efficiency was not Taft-Hartley's only goal. Taft-Hartley's redesign of the Board also sought to enhance the quality of NLRB decisions by creating a Board which would act "like an appellate court where the divergent views of the different justices may be reflected in each decision." S. Rep. No. 80-105 at 9; <u>see also</u> <u>Snell Island SNF LLC</u>, 568 F.3d at 420 ("Our survey of the legislative history of the Taft-Hartley Act, which created the NLRB's panel system, reveals that the broad animating purpose of the legislation was to equalize the balance of power between employers and employees in response to the widespread feeling that the unions had gotten too much power during the Roosevelt years.") (internal citation omitted). The fact that this goal would be undermined by regularly allowing a two-member Board to adjudicate administrative appeals or otherwise make important Board decisions counsels against the Seventh Circuit's reading of the legislative history.

[5]

Although two circuits have applied <u>Chevron</u> deference to the Board's interpretation of § 3(b), neither court's <u>Chevron</u> analysis was proper. The Second Circuit in <u>Snell Island</u> assumed the Board's interpretation of § 3(b) carried the force of law without discussing how the interpretation was promulgated. <u>See</u> 568 F.3d at 423-24. The First Circuit in <u>Ne. Land Serv.'s, Ltd. v. Nat'l Labor Relations Bd.</u> also skipped this analytical step, assuming that some deference was owed to the Board's interpretation of § 3(b) but failing to support that assumption. <u>See</u> 560 F.3d 36, 40-41 (1st

## 1. Administrative Interpretations Carrying the Force of Law

The premise of <u>Chevron</u>'s first analytical step is that "[n]ot every agency interpretation of its governing statute is entitled to *Chevron* deference." <u>Marmolejo-Campos</u>, 558 F.3d at 908 ; <u>see also</u> <u>Crandon v. U.S.</u>, 494 U.S. 152, 177 (1990) (Scalia, J. concurring) ("[T]he vast body of *administrative* interpretation that exists-innumerable advisory opinions not only of the Attorney General, the OLC, and the Office of Government Ethics, but also of the Comptroller General and the general counsels for various agencies-is not an administrative interpretation that is entitled to deference under *Chevron*"). The cornerstone of this analysis is to determine whether "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." <u>U.S. v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001); <u>accord</u> <u>Marmolejo-Campos</u>, 558 F.3d at 908. To make such a determination, the interpreting agency's organic statute must be scrutinized and the interpretation at issue must be located on what the Ninth Circuit has called a "continuum of agency deference." <u>U.S. v. W.R. Grace & Co.</u>, 429 F.3d 1224, 1235 (9th Cir. 2005).

On one end of the continuum are statutory interpretations produced by notice-and-comment rule-making or a formal adjudication, which generally command full <u>Chevron</u> deference. <u>See</u> <u>Mead Corp.</u>, 533 U.S. at 229 ("We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed."). However, there is precedent suggesting that even notice-and-comment rule-making or a formal adjudication may sometimes be insufficient to qualify for deference. <u>See</u> <u>e.g.</u> <u>Estrada-Espinoza v. Mukasey</u>, 546 F.3d 1147, 1157-58 (9th Cir. 2008) (*en banc*) (denying <u>Chevron</u> deference to a precedent decision of the Board of Immigration

Cir. 2009).

Appeals for failing to announce a statutory interpretation with sufficient clarity); Nat'l Cable & Telecomm.'s Ass'n v. Brand X Internet Serv.'s, 545 U.S. 967, 1004 (2005) (Breyer, J. concurring) (interpreting Mead to "hold that the existence of a formal rulemaking proceeding is neither a necessary nor a sufficient condition for according *Chevron* deference to an agency's interpretation of a statute . . . because Congress may have intended *not* to leave the matter of a particular interpretation up to the agency, irrespective of the procedure the agency uses to arrive at that interpretation").

On the other end of the continuum are administrative interpretations which are so informal as to "lack the force of law" and which "do not warrant *Chevron*-style deference." Christensen v. Harris County, 529 U.S. 576, 587 (2000) (denying Chevron deference to "policy statements, agency manuals, and enforcement guidelines"); accord Mead Corp., 533 U.S. 218 at 234 (citing Christensen to deny deference to a Customs Service tariff classification ruling); see also Am. Fed'n of Gov't Employees, AFL-CIO Local 2152 v. Principi, 464 F.3d 1049, 1057 (9th Cir. 2006) (applying Christensen to deny deference to a "decision paper" promulgated under the authority of the Secretary of the Veterans' Administration); Garcia-Quintero v. Gonzalez, 455 F.3d 1006, 1012-14 (9th Cir. 2006) (applying Mead to deny deference to an unpublished decision of the Board of Immigration Appeals). However, "the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking" or a formal adjudication "does not automatically deprive that interpretation of the judicial deference otherwise its due." Barnhart v. Walton, 535 U.S. 212, 221 (2002); accord Mead Corp., 533 U.S. at 231-32 ("[A]s significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case"); see also Davis v. U.S. Envtl. Prot. Agency, 348 F.3d 772, 780 n.5 (9th Cir. 2003) (applying Barnhart to grant deference to an Environmental Protection Agency decision reached via "informal agency adjudication"); Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004, 1012 (9th Cir. 2002) (applying Barnhart to grant

deference to a statutory interpretation promulgated by the Department of Housing and Urban Development in the federal register without notice and comment).

Accordingly, to complete the analysis, the Court must identify relevant NLRB administrative interpretations concerning the relationship between § 3(b)'s two quorum clauses and determine if any such interpretation carries "the force of law," potentially meriting <u>Chevron</u> deference. <u>Mead Corp.</u>, 533 U.S. at 221.

**2. Relevant Board Interpretations of Section 3(b)**

Section 6 of the NLRA confers upon the Board authority to interpret the Act either through administrative adjudications or rule-makings, at the Board's election. <u>See</u> 29 U.S.C. § 156 ("The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by [the Administrative Procedure Act], such rules and regulations as may be necessary to carry out the provisions of this subchapter."); <u>Nat'l Labor Relations Bd. v. Bakers of Paris, Inc.</u>, 929 F.2d 1427, 1440 n.14 (9th Cir. 1991) ("We note that it is a question left to the Board's discretion whether to promulgate a rule by way of administrative rule-making procedures or by adjudication."); <u>Nat'l Labor Relations Bd. v. Children's Baptist Home of S. Cal.</u>, 576 F.2d 256, 260 (9th Cir. 1978) (same). The Court has identified two Board interpretations of § 3(b)'s quorum clauses which, on their face, appear to be authorized administrative interpretations of the NLRA vis-a-vis § 6. The first is a "Minute of Board Action" from December 20, 2007 which interprets § 3(b) to allow the delegation of authority from four members to three members as a method of permitting a two-member Board to lawfully administer the Act after December 31, 2007 (Doc. 47 Ex. A). The second is a line of adjudicative precedent which upheld the authority of a two-member Board to administer the NLRA against parties' arguments that a two-member Board lacked jurisdiction for failing to comply with § 3(b)'s three-member quorum clause. <u>See e.g.</u> <u>Wiers Int'l Trucks, Inc.</u>, 353 NLRB No. 48 (2008); <u>Fluor Daniel, Inc.</u>, 353 NLRB No. 79 (2009);

CNN Am., Inc., 353 NLRB No. 94 (2009). Both interpretations essentially adopted the Seventh Circuit's analysis of § 3(b) and, if worthy of deference, would require the Board's jurisdiction to be upheld in the current proceedings. The issue is to determine where each interpretation falls on the "continuum of agency deference" and thus whether either interpretation carries the force of law. W.R. Grace & Co., 429 F.3d at 1235.

**3. Minute of Board Action**

The December 20 Minute of Board Action ("Minute") interprets § 3(b) to allow the delegation of authority from four members to three members as a method of permitting a two-member Board to lawfully administer the Act after the anticipated loss of two members on December 31, 2007. In support, the Minute directly cites § 3(b) and states: "The Board is of the view that this [delegation] will permit the remaining two Members to issue decisions and orders . . . because the remaining Members will constitute a quorum of the three-member group" (Doc. 47 Ex. A). For additional support, the Minute cites a 2003 opinion from the Office of Legal Counsel: "In addition to the statutory language, the Board relied on the legal analysis and U.S. Circuit Court precedent set forth in the March 4, 2003 opinion issued by the Office of Legal Counsel" (Doc. 47 Ex. A). See Op. Off. Legal Counsel, 2003 WL 24166831. This is the extent of the Board's analysis.

Because the Minute outlines prospective policy and does not adjudicate the rights of specific parties, it is more akin to rule-making than an adjudication. Compare 5 U.S.C. § 554 (Administrative Procedure Act guidelines for administrative adjudications) with 5 U.S.C. § 553 (Administrative Procedure Act guidelines for administrative rule-making). However, the Minute's interpretation of § 3(b) is not a product of a notice-and-comment rule-making procedure and thus does not have the presumption of legal authority generally accorded to

formal agency rules.[6]  See Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 316 F.3d 913, 921 (9th Cir. 2003) ("notice-and-comment rulemaking is a good indicator that *Chevron* deference is warranted").  To determine if the Board's interpretation carries the force of law despite the absence of notice-and-comment procedure, the Minute must be examined in light of the factors announced by the Supreme Court in Mead and Barnhart, including: the interstitial nature of the legal question, the importance of the question to the administration of the statute, the careful consideration and expertise with which the agency addressed the question, and the consistency with which the agency has implemented its interpretation.  See 533 U.S. at 228; 535 U.S. at 222.

a. Interstitial Nature of the Legal Question

There is no definitive guidance in the text or legislative history of § 3(b) which reconciles the statute's two quorum clauses.  Thus the interpretive question before the Court falls squarely within the interstices of the statute.  This factor weighs in the Board's favor.

---

6

It is noted that the Board's use of notice-and-comment rule-making procedures has been rare and thus there is sparse case law applying Chevron to Board regulations.  See Nat'l Labor Relations Bd. v. Wyman, 394 U.S. 759, 765 n.3 (1969) ("The Board has never utilized the Act's rule-making procedures."); Cynthia L. Estlund, The Ossification of American Labor Law, 102 Colum. L. R. 1527, 1566 (Oct. 2002) (noting that between 1935 and 1997 the Board engaged in only two rule-makings).  Nevertheless, it appears that statutory interpretations promulgated through Board notice-and-comment rule-making would receive the same level of Chevron deference as interpretations promulgated through formal adjudications.  See  United Food and Commercial Workers Union, Local 1036 v. Nat'l Labor Rel Bd., 307 F.3d 760, 766 (9th Cir. 2002) (*en banc*) (In the context of a formal adjudication, "[t]he *Chevron* doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute."); Am. Hosp. Ass'n v. Nat'l Labor Relations Bd., 899 F.2d 651, 655 (7th Cir. 1990) (The Board's "rulemaking power is not less when it proceeds, under the explicit authority of section 6, in accordance with the procedures that the Administrative Procedure Act prescribes for rulemaking" than when it issues rulings through adjudicative proceedings).

b. Importance of the Question

If the D.C. Circuit's interpretation of § 3(b) is adopted, the current Board would be prevented from administering almost all statutorily prescribed functions until additional Board members are appointed.[7] Because a virtual agency shutdown is a question of serious importance relating to the administration of the Act, this factor weighs in the Board's favor. Cf. Barnhart, 535 U.S. at 217 (an agency interpretation which would save the Social Security Administration $80 billion was of sufficient importance to weigh this factor in the agency's favor).

c. Careful Consideration

A common basis for measuring the careful consideration which an agency accords to a question of statutory interpretation is the public nature of the decision, that is, whether the decision was published or otherwise available for public discussion. See e.g. Wilderness Soc'y, 316 F.3d at 921-22 (Environmental Protection Agency permit decision was carefully considered because of compliance with National Environmental Policy Act procedures, publication of an Environmental Assessment and subsequent public comment); Schuetz, 292 F.3d at 1012 (Department of Housing and Urban Development interpretation was carefully considered after publication in the federal register, given time constraints that did not permit notice-and-comment); Tualatin Valley Builders Supply, Inc. v. U.S., 522 F.3d 937, 945 (9th Cir. 2008) (O'Scannlain, J., specially concurring) (same analysis but for Internal Revenue Service interpretation published in the Internal Revenue Bulletin). Here, the Board did not

---

[7]

While § 3(b)'s quorum requirements do not apply to certain prosecutory functions of the Board, such functions are exceptions explicitly carved out from the general rule that a § 3(b) quorum is required to administer the NLRA. See e.g. 29 U.S.C. § 160(b) (permitting "the Board or a member thereof" or "a designated agent or agency" to hear complaints regarding unfair labor practices); 29 U.S.C. § 161(1) (permitting the "Board, or any member thereof" to issue investigative subpoenas).

officially publish its interpretation of § 3(b) but rather adopted the decision via an internal memorandum, the Minute of Board Action. Although the contents of the Minute were subsequently released to the public in the body of a press release, dated December 28, 2008, this is not the type of formal publication which is associated with careful consideration, such as the Federal Register, the Internal Revenue Bulletin or an Environmental Assessment published pursuant to the National Environmental Policy Act (Doc. 28 Ex. A). Accordingly, this factor weighs against the Board.

d. Expertise

One of the underlying policy rationales of the Chevron doctrine is that, when Congress leaves a question unanswered in a statute, it has implicitly chosen to rely on the expertise and experience of the administering agency to resolve the matter with the precision and foresight which Congress is often incapable of mustering during the legislative process. See Chevron U.S.A., Inc., 467 U.S. at 865 ("Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases. Perhaps that body consciously desired the [agency] to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so"). Thus, when an agency interprets a statute outside the confines of a notice-and-comment rule-making or a formal adjudication, the agency's interpretation will be accorded great respect, even Chevron deference, if it is clear that such interpretation is the product of the agency's wealth of expertise and experience concerning the regulated matter.

For example, in Barnhart, the Social Security Administration's interpretation of what constitutes a disability under the Social Security Act received Chevron deference, in part, because of the complexity of administering such a large entitlement program and the realization that interference with the agency's interpretation could wreak havoc on a carefully

calibrated social welfare program, resulting in large increases in claims and billions of dollars in additional operating costs.  See 535 U.S. at 225 ("The statute's complexity, the vast number of claims that it engenders, and the consequent need for agency expertise and administrative experience lead us to read the statute as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration."). Similarly, in W.R. Grace & Co., the Environmental Protection Agency's determination of what type of remedial action was necessary to address a massive toxic chemical exposure, and how to classify the remedial action, was accorded deference (although not full Chevron deference) because the "cleanup [was] a unique removal action of a size and cost not previously seen" and "[t]he need for agency expertise is particularly acute when we are faced with a complex regulatory regime, such as [the Comprehensive Environmental Response, Compensation, and Liability Act]." 429 F.3d at 1232, 1243 ("In this situation, we recognize that the 'well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (internal citation omitted).

Here, the Board's interpretation of § 3(b) did not incorporate labor-related expertise or experience.  While the Board had an opportunity to provide insight into the legislative intent of the Taft-Hartley Congress or articulate another labor-related explanation for why § 3(b) should be interpreted as suggested in the Minute, the Board's analysis drew upon neither experience nor expertise unique to the Board.  Rather, the interpretive analysis was limited to the Board's *ipse dixit* construction of § 3(b) and reliance on the analysis of the Office of Legal Counsel, which obviously has no expertise or experience in labor matters.

e. Consistency

For the purpose of a Mead and Barnhart analysis, a consistent administrative interpretation often takes the form of an agency policy which has been established for twenty years or more.  See e.g. Barnhart, 535 U.S. at 219-220 (according Chevron deference to a

"longstanding interpretation" of the Social Security Act which had been consistently applied by the Social Security Administration for more than twenty years); Ariz. Health Care Cost Containment Sys. v. McClellan, 508 F.3d 1243, 1246 (9th Cir. 2007) (according Chevron deference to a longstanding interpretation of the Indian Healthcare Improvement Act which had been consistently interpreted by the Health Care Financing Administration for twenty years). Measured by this standard, the Board's interpretation of § 3(b) is not consistent, as the interpretation appears to have been first announced in August 2005. See BNA Daily Labor Report No. 166 at A-1 (Aug. 29, 2005).

However, part of the policy rationale for according deference to longstanding, consistently applied agency interpretations is that, if the interpretation has been in existence for some time and Congress has not moved to correct the interpretation, then it may be presumed that Congress has acquiesced to the agency's analysis. See Barnhart, 535 U.S. at 220 ("Congress has frequently amended or reenacted the relevant provisions without change . . . These circumstances provide further evidence-if more is needed-that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible"). Here, although the Board's interpretation has not been in place for twenty years, arguably, four years is sufficient time for Congress to take notice of the Board's statutory interpretation and alter it if desired. The consistency factor thus weighs slightly in favor of the board.

f. Conclusion

The balance of factors weighs against treating the Minute as an agency interpretation which carries the force of law. The importance of the interpretive question weighs heavily in the Board's favor. However, it is outweighed by the Board's general failure to incorporate careful consideration and expertise into the interpretation. While "the interstitial nature of the legal question" factor weighs in the Board's favor, this factor appears to be somewhat redundant, as no Chevron analysis would be undertaken in the absence of an interpretive

question which fell within the interstices of a statute, and thus does not weigh heavily for the Board.  Id. at 222.  Accordingly, the Board's interpretation of § 3(b) promulgated in the Minute does not carry the force of law and does not merit Chevron deference.

### 4. The Wiers, Fluor Daniel and CNN Decisions

In Wiers International Trucks, Fluor Daniel, and CNN America, the Board, during the course of a formal administrative adjudication, overruled a party's challenge to the two-member Board's compliance with the NLRA quorum requirements, interpreting § 3(b) to permit a two-member Board to administer the NLRA and maintaining jurisdiction over the proceedings.  The parties' jurisdictional challenges  raised arguments similar to that of the D.C. Circuit, "that the  two-member Board does not constitute a quorum as required by statute and, therefore, the Board has no authority to issue a ruling."  Wiers Int'l Trucking, Inc., 353 NLRB No. 48 at n.4; see also Fluor Daniel, Inc., 353 NLRB No. 79 at n.5; CNN Am., Inc., 353 NLRB No. 94 at n.20.  The Board responded by describing the delegation of authority from four members to three members in December 2007 and interpreting § 3(b) to allow a two-member quorum of the three-member delegee panel to lawfully administer the NLRA.  See Wiers Int'l Trucking, Inc., 353 NLRB No. 48 at n.2 ("Pursuant to this delegation, Chairman Schaumber and Member Liebman constitute a quorum of the three-member group. As a quorum, they have the authority to issue decisions and orders in unfair labor practice and representation cases. See Sec. 3(b) of the Act."); see also  Fluor Daniel, Inc., 353 NLRB No. 79 at n.1; CNN Am., Inc., 353 NLRB No. 94 at n.1.

Precedent decisions resulting from a formal adjudication by the Board carry the force of law and the deference accorded to such decisions may extend even to an interpretation of the Board's own statutory jurisdiction.  See United Food and Commercial Workers Union, Local 1036 v. Nat'l Labor Rel Bd., 307 F.3d 760, 766 (9th Cir. 2002) (en banc) ("The Chevron doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute."); Nat'l Labor Relations Bd. v.

Kolkka, 170 F.3d 937, 939 (9th Cir. 1999) ("The NLRB's statutory interpretation of its governing statute is entitled to particular deference where, as here, the NLRB is interpreting a term in the NLRA that establishes its statutory jurisdiction."); see also Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 844-46 (1986) (according Chevron deference to the Commodity Futures Trading Commission's interpretation of its organic statute, establishing jurisdiction to hear common law counterclaims).   Although the Board's interpretation of § 3(b) contained therein is not particularly thorough or persuasive, Wiers', Fluor Daniel's and CNN's compliance with Board procedures for administrative adjudications confer upon that interpretation the force of law and open the door for Chevron deference.

The Wiers, Fluor Daniel, and CNN adjudications bear all the trappings of a formal NLRB adjudication carrying the force of law.  Each is a precedential decision, binding upon future Board actions.  cf. Garcia-Quintero, 455 F.3d at 1012-14 (denying deference to an unpublished decision of the Board of Immigration Appeals, despite the usual deferential standard applied to Board decisions, because its lack of precedential authority). The adjudications also appear to have adopted the formal procedures necessary to carry the force of law, including a formal adversarial hearing before an administrative law judge, both parties' submission of appeal briefs to the Board that argued for and required an interpretation of § 3(b), and reasoned decisions at all levels of administrative review.  See e.g. Alaska Dep't of Health and Human Serv.'s v. Cent.'s for Medicare & Medicaid Serv.'s, 424 F.3d 931, 939 (9th Cir. 2005) (holding a Centers for Medicare and Medicaid Services adjudication merited Chevron deference because "the formal administrative process . . . included the opportunities to petition for reconsideration, brief its arguments, be heard at a formal hearing, receive reasoned decisions at multiple levels of review, and submit exceptions to those decisions.").  Lastly, although not supported with settled legal authority, the Board's interpretation of § 3(b) is definitive and  without ambiguity.  cf. Estrada-Espinoza, 546 F.3d at 1157-58 (denying deference to a published Board of Immigration

Appeals decision, despite the usual deferential standard, because the Board "did not construe the statute" with sufficient clarity "and provide a uniform definition [of the contested statutory term] in the decision").

Accordingly, the Board's interpretation of § 3(b) in the Wiers, Fluor Daniel and CNN decisions carries "the force of law" and thus satisfies Chevron's first analytical step. Mead Corp., 533 U.S. at 221.

**5. Reasonableness**

Once a statute is determined to be ambiguous and an administrative interpretation carrying the force of law is identified, the interpretation will be accorded Chevron deference if it "is based on a permissible construction of the statute," that is, the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute." Ramon-Lopez v. Holder, 563 F.3d 855, 859 (2009) (internal citations omitted). Although light on substantive discussion of the statute, the Board's interpretation of § 3(b) in Wiers, Fluor Daniel and CNN is not arbitrary, capricious or contrary to the NLRA. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 846 (9th Cir. 2003) ("We can, however, uphold agency decisions of less than ideal clarity if the agency's path may reasonably be discerned, so long as we do not supply a reasoned basis for the agency's action that the agency itself has not given or attempt to make up for deficiencies in the agency's decision.") (internal citations omitted). Rather, the Board's analysis in Wiers, Fluor Daniel and CNN is clearly discernable, particularly if notice is taken of the December 20, 2007 Minute in which the Board fully adopts the 2003 analysis of the Office of Legal Counsel: Congress intended for the Board to enforce the NLRA, a policy which would be unnecessarily frustrated by a restrictive reading of the § 3(b) quorum requirements.

In this way, the Board's interpretation of § 3(b) carries the force of law, is reasonable and will be accorded <u>Chevron</u> deference. Respondent's arguments will be rejected and the Motion to Dismiss will be denied.

Accordingly,

**IT IS ORDERED** Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 28) **IS DENIED**. The Clerk of Court shall close this case.

DATED this 8th day of September, 2009.

_____
Roslyn O. Silver
United States District Judge